UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| **INTERCURRENCY SOFTWARE LLC,**<br><br>PLAINTIFF,<br><br>V.<br><br>**WORLDREMIT LIMITED,**<br><br>DEFENDANT. | **CASE NO. 2:25-CV-703-JRG**<br><br>**JURY TRIAL DEMANDED** |

### SECOND AMENDED COMPLAINT FOR PATENT INFRINGEMENT

Intercurrency Software LLC ("Intercurrency" or "Plaintiff") hereby files this Second Amended Complaint for Patent Infringement against WorldRemit Limited ("WorldRemit" or "Defendant"), and alleges, upon information and belief, as follows:

### THE PARTIES

1. Intercurrency Software LLC is a limited liability company organized and existing under the laws of the State of Texas with its principal place of business at 3333 Preston Road, Suite 300, Frisco, Texas 75034.

2. Defendant WorldRemit is a company incorporated under the laws of England, with a place of business located at 51 Eastcheap, London, England, EC3M 1DT. Defendant may be served through its U.S. subsidiary, WorldRemit Corp., and its California agent for service of process, United Agent Group Inc.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this case under 28 U.S.C. §§ 1331 and 1338(a).

4. This Court has personal jurisdiction over Defendant. Defendant has continuous and systematic business contacts with the State of Texas. Defendant transacts business within this District and elsewhere in the State of Texas. Further, this Court has personal jurisdiction over Defendant based on its commission of one or more acts of infringement of patent-in-suit in this District and elsewhere in the State of Texas.

5. Upon information and belief, Defendant transacts substantial business in the State of Texas and this Judicial District. Defendant has committed acts of infringement in this District by, among other things, offering to sell and selling products that infringe the asserted patents, including the accused products as alleged herein, as well as providing service and support to its customers in this District. Upon information and belief, Defendant, directly or indirectly, participates in the stream of commerce that results in products, including the accused products, being made, used, offered for sale, and/or sold in the State of Texas and/or imported into the United States to the State of Texas.

6. Defendant engages in business in Texas but has not designated or maintained a resident agent for service of process in Texas as required by statute. This action arises out of that business.

7. WorldRemit, acting in concert with its subsidiaries and affiliates, research and development, offering, sales and related technical services focused on global money currency conversions and transfers requiring currency exchanges, through its promotion and control of its website https://www.worldremit.com/en, worldwide, including throughout the United States and within Texas. Defendant's currency exchanges and transfers are made outside and inside the United States of America and sold to end-users via the Internet and via distribution partners, retailers, reseller

partners, and solution partners, including WorldRemit Corp., all jointly and severally liable for operating with the global brand WorldRemit.[1] Those sales occur in the United States, and throughout Texas, including in this District.

8. WorldRemit, acting in concert with its subsidiaries and affiliates, boasts all credit globally, such as its statements:

> "Over the last ten years, our business has grown to serve 5.7 million customers, using 70 different currencies, across 130 countries worldwide.."[2]
>
> "With 1000+ employees around the world."[3]
>
> "We also have regional hubs around the world - in the Philippines, the *United States*, Nigeria, Poland and Cameroon."[4]



9. Defendant boasts having employees worldwide, which includes its employees in Texas.[5]

10. WorldRemit owns or controls, directly or indirectly, each of the WorldRemit entities with which it coordinates the infringing design, development, maintenance, management, operation, or use of the Accused Instrumentalities and website infringing in this lawsuit, including the other products.

---

[1] *See* https://www.worldremit.com/en/worldremit-group (list of WorldRemit brand companies worldwide)
[2] *See* https://www.worldremit.com/en/about-us
[3] *Id.*
[4] *Id.*
[5] *See* https://www.linkedin.com/company/worldremit/people/?facetGeoRegion=102748797 (result for WorldRemit's LinkedIn for Texas People)

SECOND AMENDED COMPLAINT FOR PATENT INFRINGEMENT                3

Indeed, "Fast, flexible and secure international money transfers across the world. Save time and money when you send money internationally with us."[6] "The cost and speed of a money transfer depends on the receiving country, the receive method as well as how it is paid for. Currently, there are a maximum of four different receive methods available on WorldRemit.,"[7] including to the United States, including Texas. At the direction or control of WorldRemit, the Accused Instrumentalities are designed, operated and provided to customers in the United States. WorldRemit reports U.S. sales of the Accused Products as its own. WorldRemit advertises that it is responsible for the services, rather than through third parties.[8]

11. WorldRemit Corp., an affiliate of WorldRemit through its long winded corporate chain that it owns or controls, directly or indirectly, each of the WorldRemit entities with which it coordinates, has been and is involved in designing, operating and providing the Accused Instrumentalities to the U.S., including Texas: "WorldRemit Corp is part of the WorldRemit Group. For a list of companies in the WorldRemit Group click here." [9,10] WorldRemit knows that the Accused Instrumentalities it designs, operates and provides are intended for the United States market. Indeed, the WorldRemit Privacy Policy makes it clear World Remit Corp. will be sharing the data and information with WorldRemit and all of its affiliates: "we share your information with our affiliates and other companies within the WorldRemit group of companies (such as WorldRemit UK Limited, WorldRemit Inc and WorldRemit Belgium SA."[11]

12. WorldRemit—with its affiliates—comprise one of the world's leading online global payment providers. Together, WorldRemit and its controlled subsidiaries, including WorldRemit Corp.,

---

[6] *See* https://www.worldremit.com/en
[7] *Id.*
[8] *Id.*
[9] *See* https://www.worldremit.com/en/about-us/privacy-policy
[10] *See* https://www.worldremit.com/en/worldremit-group
[11] *See* https://www.worldremit.com/en/about-us/privacy-policy

SECOND AMENDED COMPLAINT FOR PATENT INFRINGEMENT                                4

13. design, operate and provide the WorldRemit Website to the United States, that results in sales and advertising in the United States. WorldRemit's services are marketed, offered for sale, and/or sold throughout the United States, including within this District.[12]

14. WorldRemit and its controlled subsidiaries and affiliates, including WorldRemit Corp., are part of the same corporate structure and operational chain for the making, importing, offering to sell, selling, and using of the accused instrumentalities in the United States, including in the State of Texas generally, and this Judicial District in particular. WorldRemit engages in coordinated and concerted action to direct the Accused Instrumentalities throughout the United States, including Texas.[13]

15. WorldRemit and its controlled subsidiaries and affiliates, including Worldremit Corp., share the same management, common ownership, advertising platforms, facilities, distribution chains and platforms, and Accused Instrumentalities and related technologies.[14]

16. In the promotional materials, manuals, guides, terms of use, sales agreements, warranties, or similar documentation related to the Accused Instrumentalities, WorldRemit regularly omit which specific WorldRemit company or entity is responsible for the documents or associated products, or instead identify "WorldRemit." As a result, customers of the Accused Instrumentalities understand that WorldRemit and WorldRemit as a whole, designs, operates and provides the Accused Instrumentalities.

17. WorldRemit, and WorldRemit as a whole, holds itself out as the entity that designs, develops, maintains, manages, operates, and uses the Accused Instrumentalities and website infringing in this lawsuit in the United States, including Texas. For example, the WorldRemit Website provides

---

[12] *Id.* ("We may collect information about You from our affiliates and other companies in the WorldRemit Group.")
[13] *Id.*
[14] *Id.*

a specific page for its various global entities, including the United States, for support and does not delineate between different global entities under its control.[15]

17. WorldRemit and its controlled subsidiaries and affiliates, including Worldremit Corp., operate as a unitary business venture and are both jointly and severally liable for the acts of patent infringement alleged herein.[16]

18. On information and belief, WorldRemit and its controlled subsidiaries and affiliates, including Worldremit Corp., directly and/or indirectly develop, design, manufacture, distribute, market, offer for sale, and/or sell infringing products and services in the United States, including in the Eastern District of Texas, and otherwise directs infringing activities to this District in connection with their products and services.

19. Upon information and belief, Defendant is engaged in research and development, offering, sales and related technical services focused on global money currency conversions and transfers requiring currency exchanges. Defendant promotes and controls https://www.worldremit.com/en.

20. Venue is proper in this Judicial District pursuant to 28 U.S.C. §§ 1391(b), 1391(c) and 1400(b) because, among other things, Defendant is subject to personal jurisdiction in this Judicial District, Defendant has regularly conducted business in this Judicial District, certain of the acts complained of herein occurred in this Judicial District, and Defendant is not a resident in the United States and may be sued in any judicial district.

## PATENTS-IN-SUIT

21. Plaintiff is the sole and exclusive owner, by assignment, of U.S. Patent No. 11,620,701 ("the '701 Patent" or "Patents-in-Suit").

---

[15] *See* https://www.worldremit.com/en/contact-us (listing a number for United States support amongst every country in the world and not identifying separate entities for each country)
[16] *Id.*

22. By written instruments duly filed with the United States Patent and Trademark Office, Plaintiff is assigned all rights, title, and interest in the Patents-in-Suit. As such, Plaintiff has sole and exclusive standing to assert the Patents-in-Suit and to bring these causes of action.

23. The Patents-in-Suit are valid, enforceable, and were duly issued in full compliance with Title 35 of the United States Code.

24. The Patents-in-Suit have been cited patents issued to well-known industry leaders, including industry giant Bank of America.

25. The Patents-in-Suit each include numerous claims defining distinct inventions. No single claim is representative of any other. Each claim of the Patents-in-Suit recite distinct claim limitations that further define variations of the inventiveness of the claimed subject matter. For example, dependent claim 10 of independent claim 8 of the '701 patent recites "wherein the conditions are periodically checked in the trading server with respect to an updated market value of the asset and an updated prevailing currency exchange rate calculated from the at least one currency exchange server right before the transaction takes place," which includes the term "automatically calculated," which is not present in claim 1 of the '701 Patent. '701 patent, cl. 10. In addition, dependent claim 4 and of the '701 patent recites the steps of "wherein the first prevailing exchange rate and the second prevailing exchange rate are automatically calculated in different times by the trading server from a network including the at least one currency exchange server," which includes the term "automatically calculated," which is not present in claim 1. '701 patent, cl. 4.

26. The priority date of each of the Patents-in-Suit is at least as early as April 18, 2007. The Patents-in-Suit generally relate to the area of transactions in finance. More particularly, the Patents-in-Suit are related to systems and methods for providing a consolidated trading platform allowing traders to trade various assets in a preferred currency regardless where and in what currency the asset is

typically traded. As of the priority date, the inventions as claimed were novel, non-obvious, unconventional, and non-routine. Indeed, the Patents-in-Suit overcame a number of specific technological problems in the industry and provided specific technological solutions.

27. By way of example, as of the date of invention, the prior art of financial service providers which allowed foreign investors to trade U.S. securities required the trades to be done in U.S. currency, which required the use of foreign currency exchange brokers before and after trading to realize profits. This did not allow foreign investors to have "certain knowledge of what profit or loss he was going to get because the currency exchange rate must be obtained for a bulk amount at another time, which may fluctuate significantly enough to affect the ultimate profit or loss." *See* '701 Patent, Col. 1, ll. 38-60.

28. The prior art did not perform the "the currency conversion [sic] at a transactional level … so that a trader or investor knows exactly what profit or loss may occur with a transaction." The prior art did not "show prices as well as conduct all transactions in a currency preferred by an investor, regardless of whatever currency being used in the primary market for the security/asset." *Id.*, Col. 1, ll. 61-7 and Col. 2, ll. 1-3.

29. To overcome the above deficiencies in the prior art, The Patents-in-Suit provided "methods, processes and systems for conducting security transactions in a preferred currency, regardless of what original or market currency the securities are being traded in and where the transaction may take place." *Id.*, Col. 2, ll. 15-9.

30. To do so, the Patents-in-Suit, unlike the prior art, provide "a three-tier architecture [sic] which includes a brokerage, a market exchange where securities/assets are traded, and a currency exchange where amounts in one currency can be converted to corresponding amounts in another currency at prevailing rates," which "presents all prices, market data, P&L estimates, and

transaction results or settlements in a preferred currency, in conjunction with the market exchange and the currency exchange." *Id*., Col. 2, ll. 24-33.

31. Again, unlike prior art methods and systems, the Patents-in-Suit provide methods and systems so that "a trader always knows exactly what he/she may end up with a transaction of an asset [and] when the transaction of the asset is performed, the consolidated trading platform can also perform a currency conversion automatically based on specified conditions." *Id*., Col. 2, ll. 33-8.

32. The inventions of the Patents-in-Suit also contemplate that "orders with conditions (*e.g*., a limit order, or a stop order) are only executed when the conditions are met with reference to the market price from the market exchange together with the currency exchange rate from the currency exchange." *Id*., Col. 2, ll. 45-9.

33. Moreover, any arguments relating to eligibility as may be made by Defendant here are necessarily merely cumulative with those already considered, and rejected, by the Patent Examiners in allowing the Patents-in-Suit. *See, e.g., Technology Licensing Corp. v. Videotek, Inc.,* 545 F.3d 1316, 1337 (Fed. Cir. 2008); *Stone Basket Innov. v. Cook Medical,* 892 F.3d 1175, 1179 (Fed. Cir. 2018).

34. The claims of the Patents-in-Suit are not drawn to laws of nature, natural phenomena, or abstract ideas. Although the systems and methods claimed in the Asserted Patents are ubiquitous now (and, as a result, are widely infringed), the specific combinations of elements, as recited in the claims, were not conventional or routine at the time of the invention. Indeed, the Patents-in-Suit allow for a trading server coupled to a market and currency exchange server, wherein the costs and fees associated with the trading server are dynamically changed in accordance with the prevailing exchange rate updated constantly. This is a solution to the technical problem facing the industry in 2007 associated with the difficulty of a trader - before a trade which involves different currencies

- having some knowledge of the updated costs and fees associated with the trade. The prior art systems could not technically perform and provide that solution.

35. Further, the Patents-in-Suit utilize an unconventional specialty trading server, wherein the trading server is coupled to a market and currency exchange server, wherein the costs and fees associated with the trading server are dynamically changed in accordance with the prevailing exchange rate updated constantly, in order to provide the technical improvement over existing trading systems that were previously used in brokerage firms (*e.g.,* Charles Schwab). Thus, the Patents-in-Suit recite a technical solution to a problem arising in the realm of computing networks in finance, which is significantly more than an abstract idea.

36. Indeed, when buying and selling a stock, speed and accuracy are both critically important and are captured in the asserted claims, as the inventor created a Graphical-User-Interface design that helps a trader buy and sell a stock with certainty even the currency exchange rates fluctuate rapidly, which humans and previous trading systems could not technically perform at all.

37. Thus, the Patents-in-Suit have a clear, concrete and tangible form in that they are directed to providing utilize an unconventional specialty trading server coupled to a market and currency exchange server, wherein the costs and fees associated with the trading server are dynamically changed in accordance with the prevailing exchange rate updated constantly, with tangible and concrete hardware that has been adapted for that purpose.

38. Further, the claims of the Patents-in-Suit contain inventive concepts. Even if a court ruled the underlying aspects to be abstract, the inventive concepts disclosed in sufficient detail would transform the claims into patent-eligible subject matter.

39. In particular, the Patents-in-Suit are tied to a utilize an unconventional specialty trading server that is linked to both a currency exchange server and a market exchange server. '701 Patent, Cl. 1.

Within the trading server, "the costs and fees are caused to be displayed on a display device of the client machine and are dynamically changed in accordance with a first prevailing exchange rate between the first currency and the second currency." '701 Patent, Cl. 1. The Asserted Claims are also tied to a client machine and a display. The use of a specialized server and a client machine with a display are essential to the operation of the claimed systems.

40. The Patents-in-Suit claim a "trading server" that is not an "off-the-shelf generic computer component," but rather a specialized trading server coupled to a market and currency exchange server, wherein the costs and fees associated with the trading server are dynamically changed in accordance with the prevailing exchange rate updated constantly. The Patents-in-Suit claim a "trading server" that is certainly a specialized computer. The trading server includes the transmission of "the costs and fees are caused to be displayed on a display device of the client machine and are dynamically changed in accordance with a first prevailing exchange rate between the first currency and the second currency." '701 Patent, Cl. 1.

41. Patent Examiners investigated fields of art exactly relevant to the patented inventions, such as G06Q40/00 and G06Q40/04.

42. Specifically, the examiner investigated G06Q40/00, which covers subject matter drawn to a computerized arrangement for planning the disposition or use of funds or securities, or extension of credit; data processing systems or processes specially adapted for financial applications, *e.g.* management of monetary assets in data processing systems or on-line banking, electronic funds transfer (eft) systems, financial or exchange applications, e.g. trading stock, options, ordering of stock, index balancing investment, e.g. fund management, and portfolio management.

43. Additionally, the examiner also performed searches in the field of G06Q40/04, which covers the trading or exchange of securities or commodities within an organized system; data processing

SECOND AMENDED COMPLAINT FOR PATENT INFRINGEMENT                                                                 11

systems or processes specially adapted for trading in the context of stock, FX exchanges, *e.g.* trading of stocks and currency exchange; Stock exchange applications, *e.g.* Trading stock, options, ordering of stock, general stock trading administration Foreign exchange, *e.g.* currency trading and currency exchange.

44. The claims of the Patents-in-Suit are patent eligible under 35 U.S.C. § 101, 102, 103, and 112, as reflected by the fact that three different Patent Examiners all agreed and allowed the Patents-in-Suit over extensive prior art as disclosed and of record during the prosecution of the Patents-in-Suit. *See Stone Basket Innov.,* 892 F.3d at 1179 ("when prior art is listed on the face of a patent, the examiner is presumed to have considered it") (citing *Shire LLC v. Amneal Pharm., LLC,* 802 F.3d 1301, 1307 (Fed. Cir. 2015)); *Exmark Mfg. v. Briggs & Stratton,* 879 F.3d 1332, 1342 (Fed. Cir. 2018).

45. After giving full proper credit to the prior art and having conducted a thorough search for all relevant art and having fully considered the most relevant art known at the time, the United States Patent Examiners allowed all of the claims of the Patents-in-Suit to issue. In so doing, it is presumed that Examiners used their knowledge of the art when examining the claims. *See K/S Himpp v. Hear-Wear Techs., LLC,* 751 F.3d 1362, 1369 (Fed. Cir. 2014). It is further presumed that Patent Examiners had experience in the field of the invention, and that the Patent Examiners properly acted in accordance with a person of ordinary skill. *In re Sang Su Lee,* 277 F.3d 1338, 1345 (Fed. Cir. 2002).

46. The claims of the Patents-in-Suit are novel and non-obvious, including over all non-cited art that is merely cumulative with the referenced and cited prior art. *See* 37 C.F.R. § 1.56(b) (information is material to patentability when it is not cumulative to information already of record in the application); *see also AbbVie Deutschland GmbH v. Janssen Biotech,* 759 F.3d 1285, 1304 (Fed.

Cir. 2014); *In re DBC,* 545 F.3d 1373, 1382 (Fed. Cir. 2008). Likewise, the claims of the '701 Patent are novel and non-obvious, including over all non-cited contemporaneous state of the art systems and methods, all of which would have been known to a person of ordinary skill in the art, and which were therefore presumptively also known and considered by the Examiners. *See, e.g., St. Clair I.P. Consultants v. Canon, Inc.,* 2011 WL 66166 at *6 (Fed. Cir. 2011); *In re Sang Su Lee,* 277 F.3d 1338, 1345 (Fed. Cir. 2002); *In re Koninklijke Philips Patent Litigation,* 2020 WL 7392868 at *19 (N.D. Cal. 2020); *Standard Oil v. American Cyanamid,* 774 F.2d 448, 454 (Fed. Cir. 1985) (persons of ordinary skill are presumed to be aware of all pertinent prior art).

47. The Patents-in-Suit provide a discrete technical improvement over prior trading platforms that could not show a trader the full costs and fees of the transaction at the time of the trade. As described in the specification, the Patents-in-Suit solve the discrete technical problem facing trading platforms at that time: "perform[ing] currency conversion on a transactional level so that a trader or investor knows exactly what profit or loss may occur with a transaction." '701 Patent (Col. 1, ll. 63-6). Prior platforms were not able to provide this technical need.

48. The specific ordered combinations of the claim elements were not well-understood, routine, or conventional as of the Patents-in-Suit filing dates. "[I]nventions that are comprised of elements that are individually well-known in the prior art can still satisfy *Alice* Step 2 if the 'ordered combination' of those elements embodies an inventive concept." *PPS Data, LLC*, 404 F. Supp. 3d at 1039–40; *see also BASCOM Glob. Internet Servs., Inc. v. AT & T Mobility LLC*, 827 F.3d 1341, 1349 (Fed. Cir. 2016) ("The 'inventive concept' may arise in one or more of the individual claim limitations or in the ordered combination of the limitations.").

49. Each claim of each patent of the Patents-in-Suit are not representative of the others. "Each claim of a patent [] shall be presumed valid independently of the validity of other claims." 35 U.S.C. §

282(a). While all claims of the Patents-in-Suit recite certain important features of the inventive concept, other asserted claims recite distinct claim limitations that further define variations of the inventiveness of the claimed subject matter.

## THE ACCUSED INSTRUMENTALITIES

50. Upon information and belief, Defendant makes, sells, advertises, offers for sale, uses, or otherwise provides an apparatus and method for a consolidated trading platform covered by the Patents-in-Suit, including its WorldRemit international money transfer platforms and systems, as represented below and in Exhibit A, including all augmentations to these platforms or descriptions of platforms. Collectively, all the foregoing is referred to herein as the "Accused instrumentalities."



*See* https://www.worldremit.com/en  (screenshot Defendant's offering international money transfers requiring currency conversion, with Accused Instrumentalities).

## COUNT I
## Infringement of U.S. Patent No. 11,620,701

51. Plaintiff incorporates the above paragraphs by reference.

52. Defendant has been on actual notice of the '701 Patent at least as early as the date it received service of the Original Complaint in this litigation.

53. Plaintiff or its predecessors-in-interest have satisfied all statutory obligations required to collect pre-filing damages for the full period allowed by law for infringement of the '701 patent, thus the

SECOND AMENDED COMPLAINT FOR PATENT INFRINGEMENT                                              14

damages period begins at least as early as six years prior to the date of service of the Original Complaint in this litigation.

54. Defendant manufactures, sells, offers for sale, owns, directs, and/or controls the operation of the Accused Instrumentalities and generates substantial financial revenues and benefits therefrom.

55. Defendant has directly infringed and continues to directly infringe the claims of the '701 Patent. As exemplary, Claims 1 and 8 are infringed by making, using, importing, selling, and/or offering for sale the Accused Instrumentalities. Defendant directly makes and sells the infringing Accused Instrumentalities at least because it is solely responsible for putting the infringing systems into service by directing or controlling the systems as a whole and by obtaining the benefits therefrom. More specifically, Defendant provides a trading server, such as the Defendant trading servers coupled to one or more currency exchange servers, such as Defendant servers, and one or more market exchange servers.

56. Further on information and belief, Defendant directly uses the infringing Accused Instrumentalities at least because it assembled the combined infringing elements and makes them collectively available in the United States, including via its Internet domain web pages and/or software applications, as well as via its internal systems and interfaces. Further, and on information and belief, Defendant has directly infringed by using the infringing Accused Instrumentalities as part of its ongoing and regular testing and/or internal legal compliance activities. Such testing and/or legal compliance necessarily requires Defendant to make and use the Accused Instrumentalities in an infringing manner. Still further, Defendant is a direct infringer by virtue of its branding and marketing activities, which collectively comprise the sale and offering for sale of the infringing Accused Instrumentalities.

57. As shown above, Defendant is making, using, and offering for sale the Accused Instrumentalities.

58. Additionally, upon information and belief, Defendant owns, directs, and/or controls the infringing method operation of the Accused Instrumentalities.

59. On information and belief, the infringement of the '701 Patent by Defendant will now be willful through the filing and service of this Complaint. The '701 Patent does not expire before October 28, 2033.

60. In addition or in the alternative, Defendant now has knowledge and continues these actions and it indirectly infringes by way of inducing direct infringement by others and/or contributing to the infringement by others of the '701 Patent in the State of Texas, in this judicial district, and elsewhere in the United States, by, among other things, making, using, importing, offering for sale, and/or selling, without license or authority, infringing services for use in systems that fall within the scope of the claims of the '701 Patent. This includes without limitation, one or more of the Accused Instrumentalities by making, using, importing offering for sale, and/or selling such services, Defendant injured Plaintiff and is thus liable to Plaintiff for infringement of the '863 Patent under 35 U.S.C. § 271.

61. Now with knowledge of the '701 Patent, Defendant induces infringement under Title 35 U.S.C. § 271(b). Defendant will have performed actions that induced infringing acts that Defendant knew or should have known would induce actual infringements. *See Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 553 (Fed.Cir.1990), quoted in *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed.Cir.2006) (*en banc* in relevant part). "[A] finding of inducement requires a threshold finding of direct infringement—either a finding of specific instances of direct infringement or a finding that the accused products necessarily infringe." *Ricoh,* 550 F.3d at 1341 (citing *ACCO Brands, Inc. v. ABA Locks Manufacturer Co.*, 501 F.3d 1307, 1313, (Fed. Cir. 2007).

62. Plaintiff will rely on direct and/or circumstantial evidence to prove the intent element. *See Fuji Photo Film Co. v. Jazz Photo Corp.*, 394 F.3d 1368, 1377 (Fed. Cir. 2005) ("A patentee may prove intent through circumstantial evidence."); *Water Techs. Corp. v. Calco, Ltd.*, 850 F.2d 660, 668 (Fed. Cir. 1988) ("While proof of intent is necessary, direct evidence is not required; rather, circumstantial evidence may suffice.").

63. Defendant has taken active steps to induce infringement, such as advertising an infringing use, which supports a finding of an intention for the accused product to be used in an infringing manner. *See Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 932, 125 S. Ct. 2764, 162 L. Ed. 2d 781 (2005) (explaining that the contributory infringement doctrine "was devised to identify instances in which it may be presumed from distribution of an article in commerce that the distributor intended the article to be used to infringe another's patent, and so may justly be held liable for that infringement").

64. In addition, on information and belief, and based in part upon the clear infringement by the Accused Instrumentalities, Defendant has a practice of not performing a review of the patent rights of others first for clearance or to assess infringement thereof prior to launching products and services. As such, Defendant has been willfully blind to the patent rights of Plaintiff.

65. The foregoing infringement on the part of Defendant has caused past and ongoing injury to Plaintiff. The specific dollar amount of damages adequate to compensate for the infringement shall be determined at trial but is in no event less than a reasonable royalty from the date of first infringement to the expiration of the '701 Patent.

66. Each of Defendant's aforesaid activities have been without authority and/or license from Plaintiff.

**PRAYER FOR RELIEF**

WHEREFORE, Intercurrency Software LLC respectfully requests the Court enter judgment against Defendant as follows:

1. Declaring that Defendant has infringed the Patents-in-Suit;

2. Awarding Plaintiff its damages suffered because of Defendant's infringement of the Patents-in-Suit;

3. Enter a judgment awarding treble damages pursuant to 35 U.S.C. §284 for Defendant's willful infringement of the Patents-in-Suit;

4. Awarding Plaintiff its costs, reasonable attorneys' fees, expenses, and interest; and

Granting Plaintiff such further relief as the Court finds appropriate.

## JURY DEMAND

Plaintiff demands trial by jury, under Fed. R. Civ. P. 38.

Respectfully Submitted

*/s/* Christopher A. Honea
M. Scott Fuller
   Texas Bar No. 24036607
   sfuller@ghiplaw.com
Randall Garteiser
   Texas Bar No. 24038912
   rgarteiser@ghiplaw.com
Christopher A. Honea
   Texas Bar No. 24059967
   chonea@ghiplaw.com

**GARTEISER HONEA, PLLC**
119 W. Ferguson Street
Tyler, Texas 75702
Telephone: (903) 705-7420
Facsimile: (903) 405-3999

**ATTORNEYS FOR PLAINTIFF**
**INTERCURRENCY SOFTWARE LLC**